Filed 3/26/20

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br>v.<br><br>SADEL WILKES,<br><br>      Defendant and Appellant. | A155624<br><br>(Alameda County<br>Super. Ct. No. 17CR029738) |

Sadel Wilkes appeals his conviction, following a jury trial, for the attempted murder of Christopher W. and related crimes.  In the published portion of the opinion, we reject appellant's equal protection challenge to a statutory provision rendering youth offenders sentenced pursuant to the Three Strikes Law (Pen. Code,[1] §§ 667, subds. (b)–(j), 1170.12)—such as appellant—ineligible for youth offender parole hearings.  (§ 3051, subd. (h).)  In the unpublished portion of the opinion, we modify the judgment to strike an enhancement and award presentence conduct credits, and reject appellant's remaining challenges.

---

   * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Parts I, II, III, IV A, IV B, IV C, IV E, & IV F.

   [1] All undesignated section references are to the Penal Code.

1

BACKGROUND

A. *Trial Testimony*

*Christopher W.*

Christopher W. testified that on September 27, 2017, he went to a park with Karmisha G. and their two-year-old son. He played dice with some other people at the park, including someone known as "Nine-O." Christopher did not have any problems with anyone at the park.

After playing dice, Christopher drove off in a white Volvo with Karmisha and their son. He drove onto a freeway on-ramp and stopped, waiting for metering lights to turn green, with cars in front of and behind him. Suddenly, the front passenger window "got shot out." Christopher got out of the car and saw a man holding a gun.[2] He heard another gunshot, re-entered the car, saw that Karmisha was injured, and drove to the hospital.

In an interview with law enforcement on the day of the shooting, Christopher told officers he recognized the shooter "a hundred percent" as someone named Sadel (which he thought was spelled with a "C"), who went by the nickname Nine-O.[3] Christopher knew the shooter from the "South Hayward area" as part of a group that used to "hang out at the park." The interviewing officer testified that, the day after the shooting, Christopher identified a photograph of appellant as the shooter.[4]

---

[2] Because appellant does not dispute his identity as the shooter on appeal, we omit some of the evidence on this issue, including descriptions of the shooter and recordings of appellant's jail calls.

[3] A recording of the interview was played for the jury and a transcript was provided.

[4] At trial, Christopher testified appellant was not the shooter. He also testified that he had been harassed by people telling him not to testify and calling him a snitch.

2

*Karmisha G.*

On the day of the shooting, Karmisha G. was at a park with Christopher and their son. They left in Karmisha's white Volvo, with Christopher driving. While they were stopped at the metering light on the freeway on-ramp, Karmisha heard a loud explosion through the window and glass shattered over her face. She did not hear any additional gunshots.

*Thomas G.*

On the day of the shooting, Thomas G. was on the freeway on-ramp waiting for the metering lights. He saw a person quickly walk by, looking "determined," and head straight for the first car stopped at the metering light, approximately two cars ahead of Thomas. The person then fired multiple rounds from a semi-automatic pistol, pointing directly into the passenger side window.[5] After the first or second shot, the driver exited the car. The shooter did not change his aim during the shooting. Afterwards, the person immediately walked to a vehicle behind Thomas's.

*Tramaine C.*

On the day of the shooting, Tramaine C. saw appellant, whom he knew only as Nine-O, at a park. Tramaine did not see any problems between appellant and Christopher at the park. Tramaine left the park for five or ten minutes; when he returned, he saw Christopher walking to a white car and getting in it. Appellant was running after the white car but could not catch it.

Appellant told Tramaine that Christopher had appellant's backpack in his car and asked Tramaine for a ride. Tramaine said that he did not have any gas, but agreed when appellant offered to give him five or ten dollars, although Tramaine later forgot to collect the money. They entered

---

[5] Law enforcement found only one shell casing at the scene.

3

Tramaine's car and proceeded in the direction the white car had gone. They saw a car that looked like the white car and followed it onto the freeway on-ramp. The metering lights were on and traffic was stopped, with several cars backed up. Appellant said, "There's the car," exited Tramaine's car, and walked casually towards the white car. Tramaine lost sight of appellant after he passed four or five cars. A minute or two later appellant returned with a backpack. Tramaine was playing music in his car and did not hear any gunshots while appellant was gone. Tramaine did not see a gun, and appellant's demeanor was calm.

B. *Verdict and Sentence*

The jury found appellant guilty of the attempted murder of Christopher (§§ 187, subd. (a), 664, subd. (a)) and found true an allegation that the attempted murder was committed willfully, deliberately, and with premeditation (§ 664, subd. (a)). The jury also found appellant guilty of two counts of assault with a firearm (§ 245, subd. (a)(2)), shooting at an occupied motor vehicle (§ 246), and possession of a firearm by a felon[6] (§ 29800, subd. (a)(1)), and found true multiple firearm enhancements. In a bifurcated proceeding, appellant admitted prior conviction allegations. The trial court sentenced appellant to an aggregate prison term of 59 years, four months to life.

DISCUSSION

I. *Substantial Evidence*

Appellant argues there was insufficient evidence that (1) he intended to kill Christopher, and (2) that the attempted murder was premeditated and deliberate.

---

[6] The parties stipulated at trial that appellant had previously been convicted of a felony.

4

"The principles governing our assessment of defendant's . . . challenges to the sufficiency of the evidence are well settled.  We ' " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.] The same standard applies when examining the sufficiency of the evidence supporting a special circumstance finding.  [Citation.]  'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57 (*Brooks*).)

A.  *Intent to Kill Christopher*

" '[A]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]  Hence, in order for defendant to be convicted of the attempted murder of the [identified victim], the prosecution had to prove he acted with specific intent to kill that victim." (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).)  " 'There is rarely direct evidence of a defendant's intent.  Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.  [Citation.]  The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." [Citation.]' [Citations.]  ' "The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance.  Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind." ' " (*Id.* at p. 741.)  "An inference of

5

intent to kill drawn on evidence of a purposeful shooting with lethal force under all the attendant circumstances can support a conviction of attempted murder even without evidence of motive." (*Id.* at p. 742.)

Appellant argues there is insufficient evidence that he knew Christopher was in the front seat of the car, and therefore he could not have known he was firing directly at Christopher when he fired into the front passenger window. As appellant notes, Karmisha testified the windows were heavily tinted and could not be seen through. Nonetheless, there was evidence appellant saw Christopher get in the car. Tramaine testified that, when he returned to the park after leaving for five or ten minutes, he saw Christopher walking to a white car and getting inside, and also saw appellant running after the white car. There was no evidence appellant would have known the white car (which was Karmisha's) was associated with Christopher, unless he saw Christopher get in it. The jury could have reasonably inferred that appellant saw Christopher get into the white car, and therefore knew he was in the driver's seat.

Appellant also points to Thomas's testimony that appellant did not change his aim after Christopher exited the car, arguing this demonstrates lack of intent to kill Christopher. When Christopher was asked whether the shot fired after he exited the car was fired "at you," Christopher testified that it was. The jury could credit this testimony and infer that appellant aimed at Christopher after he exited the car. Even assuming the jury credited Thomas's testimony, any evidence of lack of intent from a second shot does not negate substantial evidence of intent in connection with the initial shot. (*Smith, supra,* 37 Cal.4th at p. 741 [" ' "The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does

6

not compel the conclusion that he lacked the animus to kill in the first instance." ' "].)

In sum, there was evidence that appellant purposefully fired a gun into the front passenger window, knowing Christopher was in the driver's seat, and that appellant fired a subsequent shot at Christopher after Christopher exited the car. This "is sufficient to support an inference of intent to kill." (*Smith, supra,* 37 Cal.4th at p. 742.)

B. *Premeditation and Deliberation*

"A 'willful, deliberate, and premeditated killing' is murder in the first degree. (§ 189.)" (*Brooks, supra,* 3 Cal.5th at p. 58.) Although "the crime of attempted murder is not divided into degrees[,] . . . [t]he prosecution may seek a jury finding that an attempted murder was 'willful, deliberate, and premeditated' for purposes of sentence enhancement. (§ 664, subd. (a)[.])" (*Smith, supra,* 37 Cal.4th at p. 740.) The jury so found here.

" ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.' [Citation.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides . . . which are the result of mere unconsidered or rash impulse hastily executed.' [Citation.] [¶] *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [citation] identified three categories of evidence relevant to deciding whether to sustain a verdict of first degree murder based on premeditation and deliberation: (1) evidence of planning activity prior to the killing, (2) evidence of the defendant's prior relationship with the victim from which the jury could reasonably infer a motive to kill,

7

and (3) evidence that the manner in which the defendant carried out the killing 'was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' [¶] The identified categories of evidence are those we ' "typically" find sufficient' to uphold first degree murder convictions. [Citation.] But we have also observed that the *Anderson* factors are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " (*Brooks, supra,* 3 Cal.5th at pp. 58–59.)

Appellant argues there is no substantial evidence of any of the three *Anderson* factors, and therefore no substantial evidence supports the jury's finding of premeditation and deliberation. We disagree.

First, there is evidence of planning, to wit, appellant brought a gun with him as he followed Christopher's car. In *People v. Romero* (2008) 44 Cal.4th 386, our Supreme Court found "the jury could infer planning" from evidence that the defendant "brought a gun to the video store where, without any warning or apparent awareness of the impending attack, [the victim] was shot in the back of the head." (*Id.* at p. 401, italics omitted.) Appellant argues there is no evidence he brought the gun "specifically for use in the encounter with [Christopher]," but there was no such evidence in *Romero* either. The jury could nonetheless infer that he did.

Second, the manner of the killing supports an inference of premeditation and deliberation. Appellant followed the car Christopher was driving and, when Christopher was stopped in traffic, appellant exited Tramaine's car and walked directly to Christopher's car. Tramaine said

8

appellant walked "casually" and Thomas testified appellant looked "determined" as he approached Christopher's car. Upon reaching the car, without any attempt to interact with Christopher or Karmisha, appellant fired a gun through the front passenger window. This conduct supports an inference " 'that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " (*Brooks, supra,* 3 Cal.5th at p. 59.)

Appellant argues the evidence demonstrates he followed Christopher to retrieve his backpack and impulsively shot the window out to facilitate this retrieval. Whether the jury could have so found is immaterial. Our review considers only whether there is substantial evidence, including any reasonable inferences, to support the verdict. (*Brooks, supra,* 3 Cal.5th at p. 57.) We conclude there is.

II. *Heat of Passion Instruction*

The trial court instructed the jury on attempted murder, premeditation and deliberation, and the lesser included offense of attempted voluntary manslaughter based on a heat of passion theory. (See CALCRIM Nos. 600, 601, 603.) The trial court did not instruct the jury to consider provocation in deciding whether any attempted murder was premeditated and deliberate.[7] (See CALCRIM No. 522 ["Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you

---

[7] Although the parties characterize the omitted instruction as addressing the impact of provocation on the degree of attempted murder, "the crime of attempted murder is not divided into degrees." (*Smith, supra,* 37 Cal.4th at p. 740.) Instead, "[t]he prosecution may seek a jury finding that an attempted murder was 'willful, deliberate, and premeditated' for purposes of sentence enhancement. (§ 664, subd. (a)[.])" (*Ibid.*)

9

conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."].)  Appellant argues the trial court erred in failing to give the instruction sua sponte and that trial counsel rendered ineffective assistance in failing to request it.  We reject the claims.

"[T]wo California Supreme Court decisions have held that there is no sua sponte duty to give CALCRIM No. 522.  [Citations.]  We are bound by Supreme Court decisions.  [Citation.]  This resolves the question of whether the trial court erred in failing to instruct on provocation vis-à-vis the attempted murder of [the victim] sua sponte." (*People v. Windfield* (2019) 44 Cal.App.5th 196, 219–220 (*Windfield*).)[8]

"[I]n order to show ineffective assistance of counsel, defendant must . . . show[] that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) that the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome." (*Windfield, supra,* 44 Cal.App.5th at p. 220.)  We need not decide whether trial counsel's performance was deficient because appellant fails to demonstrate prejudice from any deficiency.  The evidence that appellant attempted to kill Christopher in the heat of passion after being provoked by Christopher's driving off with appellant's backpack was, at best, extremely weak.  Most notably, there was no testimony indicating appellant was under the influence of intense emotion.  Tramaine testified that, when appellant asked him for a

---

8 In his reply brief, appellant argues we may review the issue despite his lawyer's failure to request the instruction because his substantial rights were affected (see § 1259).  We have not declined to review the claim as forfeited.  Instead, we reject it on the merits because the trial court had no obligation to provide the instruction sua sponte.

ride in the park, he was "kind of pissed off" but did not seem "angry." Appellant did not tell Tramaine to hurry up as they drove after Christopher's car. When appellant got out of Tramaine's car on the freeway on-ramp, he "walked casually" to Christopher's car. Thomas, Christopher, and Karmisha all testified appellant did not exchange words or otherwise interact with Christopher or Karmisha before firing into the car. Tramaine testified appellant was "calm" when he got back in the car after the shooting. No witness testified appellant's conduct or demeanor indicated the influence of intense emotion.

Appellant notes that, when returning the verdicts, the jury initially failed to indicate a finding on the premeditation and deliberation allegation, and argues this suggests the issue was "an extremely close call." The record demonstrates otherwise: according to the minute order, the trial court sent the jury back to deliberate on this finding at 10:07 a.m., and the jury returned with a finding at 10:15 a.m.

In sum, appellant has failed to demonstrate a reasonable probability that, had counsel requested the instruction, the jury verdict would have been more favorable.

III. *Prosecutor's Closing Argument*

In closing argument, the prosecutor argued as follows: " 'Deliberate.' What does that mean? Let's talk about deliberate. We've all had this situation. Maybe you get lost, you miss your turn, and every single turn says no, you can't make a U-turn or left to get there. What are you going to do? You want to get back on track. You want to go back home. You maybe start thinking no one's around, right? You start thinking in your head what happens if I make this left? Maybe I get a ticket. It's all right, I can deal with a ticket. I don't want to go into this neighborhood. You got to do a quick

balancing act in your head.  You go ahead and make that turn.  You deliberated.  That's what deliberate means.  You made a decision and you did it.  [¶]  Now, it doesn't require a lot of time.  As the instruction clearly says, this can be a cold, calculated judgment that may be arrived at in a short period of time.  Some people may right away see that no U-turn sign and say that's fine, no cops around, boom, do it.  Three seconds.  Some people may think six blocks down the way I should have done it last time, I'm nervous, I don't want to pay a ticket, I'm scared of cops.  That deliberation can take a little longer.  There's no requirement.  You don't have to sit there and get a journal and do a pro and cons list.  It means you thought about it and you made a decision."

Appellant contends the prosecutor committed misconduct with this argument because it "improperly trivialized" the issue and "oversimplified and minimized the premeditation and deliberation elements."  The claim is forfeited by appellant's failure to object below, and appellant's failure to argue any exceptions to forfeiture apply.  (*People v. Avila* (2009) 46 Cal.4th 680, 710–711 (*Avila*) ["Defendant did not object below to any of these portions of the argument or other challenged statements, no exception to the general requirement of an objection is applicable, and the claims are therefore forfeited."].)[9]

---

[9] We note that, although appellant contends our Supreme Court has indicated a similar prosecution argument was misconduct, the relied-on case does not so indicate.  In *Avila,* the Supreme Court rejected the defendant's assertion that "the prosecutor argue[d] that 'the "cold, calculated" judgment of murder is the equivalent of deciding whether to stop at a yellow light or proceed through the intersection.'  Rather, the prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick

Appellant also argues trial counsel's failure to object to the argument constituted ineffective assistance of counsel. We disagree. " ' "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." ' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.) Even assuming trial counsel's failure to object was unreasonable, appellant has not shown prejudice. The jury was properly instructed on premeditation and deliberation. (See CALCRIM No. 601.) The prosecutor's argument emphasized that deliberation does not require a substantial amount of time, but does require deliberate reflection—an accurate statement of the law. (*People v. Solomon* (2010) 49 Cal.4th 792, 812 [" ' "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " ' "].)[10] We find

judgment' that is nonetheless 'cold' and 'calculated.' He then immediately said, 'Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here.' " (*Avila, supra,* 46 Cal.4th at p. 715.) *Avila* merely rejects the appellant's characterization of the prosecutor's argument; it does not hold that, absent the last two lines, the argument was improper.

[10] Appellant provides the following quotation from *People v. Solomon, supra,* 49 Cal.4th at page 812: "frequent reliance on the 'great rapidity' with which thought may ripen into a premeditated and deliberated intent to kill . . . have collapsed any meaningful distinction between first and second degree murder." Appellate counsel's selective quotation is misleading and flatly inconsistent with the position actually taken by our Supreme Court in *Solomon.* The full passage is as follows: "Defendant claims that upholding the first degree murder verdicts under current precedent violates due process and Eighth Amendment principles. In support, he presents one commentator's view that this court's frequent reliance on the 'great rapidity' with which thoughts may ripen into a premeditated and deliberated intent to kill, coupled with our recent 'manipulation' of the *Anderson* factors, have collapsed any meaningful distinction between first and second degree

13

no reasonable probability that, had counsel objected to the prosecutor's argument, the verdict would have been more favorable.[11]

IV. *Sentencing*

A. *Senate Bill No. 1393*

The trial court imposed a five-year enhancement for a prior serious felony conviction pursuant to section 667, subdivision (a)(1).

"Senate Bill No. 1393 amended section 667, subdivision (a), and section 1385, subdivision (b), as of January 1, 2019, to allow a court to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, § 2, eff. Jan. 1, 2019.) . . . [A]t the time of [appellant's] sentencing, the trial court did not have authority 'to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under [s]ection 667.' (Former § 1385, subd. (b).) Instead, the trial court was required to impose a five-year enhancement for each prior serious felony conviction. (Former § 667, subd. (a)(1).) This change in law also applies retroactively to those like [appellant] whose sentences were not final when

---

murder. (Mounts, Premeditation and Deliberation in California: Returning to a Distinction Without a Difference (2002) 36 U.S.F. L.Rev. 261, 327–328.) This argument completely misses the mark. Defendant overlooks a core principle that has guided appellate courts in assessing the sufficiency of the evidence of premeditation and deliberation for over 60 years: 'The true test is not the duration of time as much as it is the extent of the reflection.' [Citations.] We have observed that '[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' [Citation.] Contrary to defendant's suggestion, a killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse." (*Solomon,* at pp. 812–813.)

[11] Appellant argues cumulative error prejudiced his constitutional right to a fair trial. Any assumed errors, considered together, did not so prejudice appellant.

14

Senate Bill No. 1393 became effective." (*People v. Zamora* (2019) 35 Cal.App.5th 200, 208.)

We agree with the People that no remand is required in this case because "the record reveals a clear indication of how the court would have exercised its discretion." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 426.) Most significantly, the trial court expressly stated that appellant's crimes involved "egregious conduct that warrants the maximum term permitted." In addition, the trial court imposed the upper term for both the principal determinate term and a firearm enhancement, underscoring the court's stated intent to impose the maximum term. In contrast, *McDaniels* remanded where the trial court "expressed no intent to impose the maximum sentence[;] [t]o the contrary, it imposed the midterm for being a felon in possession of a firearm, and it ran that term concurrently to the term for the murder," and "struck '[i]n the interest of justice' four prior convictions it had found true." (*Id.* at p. 428.) This case is more akin to *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, in which no remand was necessary where the trial court imposed the upper term, imposed discretionary enhancements, and stated, " 'this is the kind of individual the law was intended to keep off the street as long as possible.' " (*Id.* at p. 1896.)

B. *Lesser-Included Firearm Enhancement*

Appellant argues a firearm enhancement should be remanded because, at the time of sentencing, the trial court did not know it had discretion to impose a lesser included enhancement pursuant to *People v. Morrison* (2019) 34 Cal.App.5th 217.) For the reasons explained above in connection with the prior serious felony enhancement, we find no remand necessary because the trial court would not have exercised its discretion to impose a lesser included firearm enhancement, even if it had been aware of such discretion.

15

C. *Senate Bill No. 136*

The trial court imposed a one-year prior prison term enhancement for a 2016 grand theft conviction pursuant to section 667.5, subdivision (b).

"Prior to January 1, 2020, section 667.5, subdivision (b) required trial courts to impose a one-year sentence enhancement for each true finding on an allegation the defendant had served a separate prior prison term and had not remained free of custody for at least five years. (§ 667.5, subd. (b).) . . . Effective as of January 1, 2020, Senate Bill No. 136 (2019–2020 Reg. Sess.) amends section 667.5, subdivision (b) to limit its prior prison term enhancement to only prior prison terms for sexually violent offenses, as defined in Welfare and Institutions Code section 6600, subdivision (b)." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 681.) "Senate Bill No. 136's (2019–2020 Reg. Sess.) amendment to section 667.5, subdivision (b) applies retroactively to all cases not yet final as of its January 1, 2020, effective date." (*Id.* at p. 682.)

As the People properly concede, appellant's prior grand theft conviction is not a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). Accordingly, we will modify the judgment to strike the enhancement.[12]

D. *Youth Offender Parole Hearing*

Appellant was 25 years old when he committed the instant offenses. Pursuant to section 3051, subdivisions (a) and (b), offenders 25 years of age and younger at the time of their offense are eligible for a youth offender parole hearing after 15, 20, or 25 years in prison, depending on the sentence. (§ 3051, subds. (a)–(b).) However, section 3051, subdivision (h) provides that

---

[12] This conclusion renders moot appellant's alternative argument that the prior prison term was neither proven nor admitted.

certain youth offenders—including those sentenced pursuant to the Three Strikes Law, such as appellant—are ineligible for youth offender parole hearings.[13] Appellant argues this differential treatment of Three Strikes youth offenders violates equal protection.

"The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws. To succeed on an equal protection claim, appellant[] must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. [Citation.] . . . [¶] Where a class of criminal defendants is similarly situated to another class of defendants who are sentenced differently, courts look to determine whether there is a rational basis for the difference. [Citation.] '[E]qual protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." ' [Citation.] 'This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in " 'rational speculation' " as to the justifications for the legislative choice [citation]. It is immaterial for

---

[13] Section 3051, subdivision (h) provides, in its entirety: "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61, or to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age. This section shall not apply to an individual to whom this section would otherwise apply, but who, subsequent to attaining 26 years of age, commits an additional crime for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison."

17

rational basis review "whether or not" any such speculation has "a foundation in the record." ' [Citation.] To mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed statutory disparity. [Citations.] If a plausible basis exists for the disparity, '[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law.' " (*People v. Edwards* (2019) 34 Cal.App.5th 183, 195–196 (*Edwards*).)

Appellant argues he is similarly situated to youth offenders who were not sentenced pursuant to the Three Strikes Law, and further argues there is no rational basis for the differential treatment.

Numerous courts have rejected equal protection challenges to the differential treatment of Three Strikes offenders, concluding that such offenders are not similarly situated to non-recidivist offenders and/or that a rational basis exists to treat them differently. As one such court reasoned: "A person who has committed and been convicted of two serious or violent felonies before the instant offense is a recidivist who has engaged in significant antisocial behavior and who has not benefited from the intervention of the criminal justice system. . . . It is reasonable for the Legislature to distinguish between those felons . . . who come to court with a history of serious or violent felony convictions and those who do not." (*People v. Cooper* (1996) 43 Cal.App.4th 815, 829 (*Cooper*); see also *People v. Kilborn* (1996) 41 Cal.App.4th 1325, 1332 ["The system of imposing greater punishment on *all* persons who commit a felony-grade crime after having committed one or more serious or violent felonies in the past, is rationally related to the legitimate public objective of discouraging recidivism."]; *People v. Spears* (1995) 40 Cal.App.4th 1683, 1687 ["It is clear the Legislature intended to set appellant and other recidivists with prior 'strike' convictions

18

apart from first time offenders and those with less serious criminal histories; it is equally clear it did so with a legitimate objective in mind."]; *People v. McCain* (1995) 36 Cal.App.4th 817, 820 ["The Legislature has seen fit to increase the severity of punishment for recidivists who have committed serious or violent felonies and who again commit felony offenses. . . . [W]e cannot say harsher treatment for such recidivists is irrational or arbitrary such that it denies them equal protection under the law."].)

The reasoning of these cases applies here. The purpose of section 3051 is "to give youthful offenders 'a meaningful opportunity to obtain release' after they have served at least 15, 20, or 25 years in prison (§ 3051, subd. (e)) and made ' "a showing of rehabilitation and maturity" ' and "to account for neuroscience research that the human brain—especially those portions responsible for judgment and decisionmaking—continues to develop into a person's mid-20s." (*Edwards, supra,* 34 Cal.App.5th at p. 198.) Assuming a Three Strikes youth offender is similarly situated to other youth offenders for purposes of section 3051, the Legislature could rationally determine that the former—"a recidivist who has engaged in significant antisocial behavior and who has not benefited from the intervention of the criminal justice system" (*Cooper, supra,* 43 Cal.App.4th at p. 829)—presents too great a risk of recidivism to allow the possibility of early parole.

Appellant relies on *Edwards, supra,* 34 Cal.App.5th 183, in which the Court of Appeal held the statutory exclusion of youth offenders sentenced under the "One Strike" law (§ 667.61) violated equal protection. (*Edwards,* at p. 199.) *Edwards* discussed "a consistent theme in constitutional jurisprudence," to wit, " ' "[d]efendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers," ' " and concluded:

19

"Because the Legislature made youthful-offender parole hearings available even for first degree murderers (except those who committed murder as an adult and received an LWOP sentence), there is no rational basis for excluding One Strike defendants from such hearings." (*Edwards,* at p. 196–197.)[14]

*Edwards* is distinguishable. "The 'One Strike' law is an alternative, harsher sentencing scheme that applies to specified felony sex offenses," such that " 'a first-time offense can result in one of two heightened sentences.' " (*Edwards, supra,* 34 Cal.App.5th at p. 193.) The distinguishing characteristic of Three Strikes offenders, of course, is that they are not being sentenced for a first-time offense. Thus, the ample authority rejecting equal protection challenges from Three Strikes offenders did not apply in *Edwards*. Indeed, *Edwards* itself took pains to "note that criminal history plays no role in defining a One Strike crime" and that "[t]he problem in this case is" the categorical exclusion of "an entire class of youthful offenders convicted of a crime short of homicide . . . , *regardless of criminal history . . . .*" (*Edwards,* at p. 199, italics added.)

In sum, the differential treatment of youth offenders sentenced pursuant to the Three Strikes Law for purposes of youth offender parole hearings does not violate equal protection.

E. *Presentence Credits*

The trial court awarded appellant presentence credit for 375 actual days, but did not award conduct credits. As the People properly concede, appellant was entitled to 15 percent conduct credit. (§§ 2933.1, subd. (a)

---

[14] Of course, appellant was convicted of attempted murder, and thus is *not* the type of offender who is " ' "categorically less deserving of the most serious forms of punishment than are murderers." ' " (See *Edwards, supra,* 34 Cal.App.5th at p. 196.)

["any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit"], 667.5, subd. (c)(12) ["Attempted murder."].) The parties agree that appellant is entitled to 56 days of presentence conduct credits. We will modify the judgment accordingly.

F. *Ability to Pay Hearing*

The trial court imposed a $10,000 restitution fund fine (§ 1202.4, subd. (b)(1)), a $250 probation investigation fee (§ 1203.1b), $200 in court conviction assessments (§ 1465.8), and $150 in criminal conviction assessments (Gov. Code § 70373). Appellant argues the trial court violated his due process rights by imposing the fine, fee, and assessments without holding a hearing on his ability to pay. (See *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).) He argues his failure to object below did not forfeit his claim because *Dueñas* established a new constitutional rule and had not issued at the time of appellant's sentencing. We find the claim forfeited.

As an initial matter, *Dueñas* did not involve a section 1203.1b probation investigation fee. (*Dueñas, supra,* 30 Cal.App.5th at p. 1163.) Section 1203.1b includes express provisions regarding the determination of the defendant's ability to pay the fee. Our Supreme Court has held that an argument that this determination was not conducted is forfeited if no objection was made below. (*People v. Trujillo* (2015) 60 Cal.4th 850, 858 ["plac[ing] the burden on the defendant to assert noncompliance with section 1203.1b in the trial court as a prerequisite to challenging the imposition of probation costs on appeal is appropriate"].) Accordingly, appellant has forfeited this challenge.

21

*Dueñas* did involve the restitution fine and assessments imposed on appellant. (*Dueñas, supra,* 30 Cal.App.5th at p. 1163.) The restitution fine statute, section 1202.4, provides the amount of the fine for a felony conviction "shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000)." (§ 1202.4, subd. (b)(1).) Section 1202.4, subdivision (c) specifies, "The court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine . . . ."

Thus, "even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute (§ 1202.4, subd. (c)) expressly permitted such a challenge." (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*).) Courts have accordingly held *Dueñas* claims forfeited when the maximum restitution fine was imposed. (*Gutierrez*, at pp. 1030, 1033 [rejecting *Dueñas* challenge to $10,000 restitution fine because, "even if *Dueñas* was unforeseeable (a point on which we offer no opinion), under the facts of this case Gutierrez forfeited any ability-to-pay argument regarding the restitution fine by failing to object"]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 (*Frandsen*) ["Here, the trial court imposed the maximum restitution fine. Frandsen was thus obligated to object to the amount of the fine and demonstrate his inability to pay anything more than the $300 minimum. Such an objection would not have been futile under governing law at the time of his sentencing hearing."].) We agree with these cases and find appellant's challenge to his $10,000 restitution fine forfeited.

Appellant also challenges his remaining assessments of $200 and $150. Where a defendant forfeited a challenge to the maximum restitution fine, courts have found challenges to lesser amounts also forfeited because, as "a practical matter, if [the defendant] chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees." (*Gutierrez, supra*, 35 Cal.App.5th at p. 1033; see also *Frandsen, supra,* 33 Cal.App.5th at p. 1154 ["Given [the defendant's] failure to object to a $10,000 restitution fine based on inability to pay, [the defendant] has not shown a basis to vacate assessments totaling $120 for inability to pay."].) This reasoning is sound and we find appellant's challenge to the remaining assessments also forfeited.

## DISPOSITION

The judgment is modified to (1) strike the section 667.5, subdivision (b) enhancement, and (2) award 56 days of presentence conduct credit. As so modified, the judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment that has been modified accordingly.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

BURNS, J.

(*People v. Wilkes* / A155624)

A155624 / People v. Wilkes

Trial Court:  Superior Court of Alameda County

Trial Judge: Honorable Thomas C. Rogers

Counsel:  Jonathan Soglin, William Richard Such, and Jamie M. Weyand, By Appointment of the First District Court of Appeal under the First District Appellate Project, for Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, and Julia Y. Je, Deputy Attorney General.